Coti MATTHEWS, ON BEHALF
OF Her Minor Child, M.M.,
et al., Petitioners,

v.

KOUNTZE INDEPENDENT SCHOOL
DISTRICT, Respondent

NO. 14–0453

Supreme Court of Texas.

Opinion delivered: January 29, 2016

David W. Starnes, Beaumont, Jeffrey C. Mateer, Hiram S. Sasser III, Kelly J. Shackelford, Liberty Legal Institute, Plano, Bradley G. Hubbard, James C. Ho, Prerak Shah, Gibson Dunn & Crutcher LLP, Dallas, Mithun Mansinghani, Gibson, Dunn & Crutcher, Washington, DC, for Petitioners.

Thomas P. Brandt, Joshua A. Skinner, Fanning Harper Martinson Brandt & Kutchin, P.C., Dallas, for Respondent.

Robert M. Cohan, Jillian Harris, Jackson Walker L.L.P., Dallas, Amicus Curiae for American Jewish Committee.

Rebecca Robertson, ACLU of Texas, Houston, Amicus Curiae for American Civil Liberties Union.

Sean D. Jordan, Jackson Walker LLP, Austin, Amicus Curiae for John Cornyn and Ted Cruz.

Richard B. Farrer, Assistant Solicitor General, Office of Attorney General, Austin, Amicus Curiae for the State of Texas.

JUSTICE DEVINE delivered the opinion of the Court.

The sole issue in this interlocutory appeal is whether the defendant's voluntary cessation of challenged conduct rendered the plaintiffs' claims for prospective relief moot. The court of appeals held that it did. 482 S.W.3d 120, 127–34 (Tex.App.–Beaumont 2014) (mem.op.). Because the challenged conduct might reasonably be expected to recur, we reverse and remand.

Middle school and high school cheerleaders, through their parents, sued Kountze Independent School District after the District prohibited them from displaying banners containing religious signs or messages at school-sponsored events. The District responded by filing a plea to the jurisdiction based on governmental immunity and lack of standing. The District later supplemented that plea to assert mootness in light of its subsequent adoption of Resolution and Order No. 3, which provides that the District is "not required to prohibit messages on school banners ... that display fleeting expressions of community sentiment solely because the source or origin of such message is religious," but "retains the right to restrict the content of school banners."

The trial court denied the District's plea, and the District took an interlocutory appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). Without reaching the governmental immunity or standing issues, the court of appeals reversed the trial court's order in part, finding all the cheerleaders' claims, except for attorney's fees, moot in light of the District's adoption of Resolution and Order No. 3. 482 S.W.3d at 127–34. That is, the court of appeals held that the cheerleaders' claims for declaratory and injunctive relief are moot because the District voluntarily discontinued its prohibition on the display of banners containing religious signs or messages at school-sponsored events. The cheerleaders then petitioned this Court for review.

◼ We must first consider the matter of our own appellate jurisdiction. Interlocutory appeals, such as this one, are generally final in the courts of appeals.

*See* Tex. Gov't Code § 22.225(b)(3). Exceptions to this general rule exist, however, such as when the court of appeals holds differently from a prior decision of another court of appeals. *Id.* § 22.001(a)(2). Decisions that hold differently are defined to include those that have an "inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Id.* § 22.225(e). Since another court of appeals has required defendants to admit that their prior policies were unconstitutional in order to moot a case, and the District has not done so in this case, we have such an inconsistency. *See Lakey v. Taylor ex rel. Shearer*, 278 S.W.3d 6, 12 (Tex.App.–Austin 2008, no pet.); *Bexar Metro. Water Dist. v. City of Bulverde*, 234 S.W.3d 126, 131 (Tex.App.–Austin 2007, no. pet.); *Del Valle Indep. Sch. Dist. v. Lopez*, 863 S.W.2d 507, 511 (Tex.App.–Austin 1993, writ denied).

█ The application of the mootness doctrine is reviewed de novo on appeal. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 149–50 (Tex.2012). The mootness doctrine applies to cases in which a justiciable controversy exists between the parties at the time the case arose, but the live controversy ceases because of subsequent events. *Id.* at 162. It prevents courts from rendering advisory opinions, which are outside the jurisdiction conferred by Texas Constitution article II, section 1. *See Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex.2000) (per curiam).

█ A defendant's cessation of challenged conduct does not, in itself, deprive a court of the power to hear or determine claims for prospective relief. *Jacks v. Bobo*, No. 12–07–00420–CV, 2009 WL 2356277, at *2 (Tex.App.–Tyler 2009, pet. denied) (mem.op.) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). If it did,

defendants could control the jurisdiction of courts with protestations of repentance and reform, while remaining free to return to their old ways. *Id.* at *2–3. This would obviously defeat the public interest in having the legality of the challenged conduct settled. *Id.*

█ Nonetheless, dismissal may be appropriate when subsequent events make "absolutely clear that the [challenged conduct] could not reasonably be expected to recur." *Bexar Metro. Water Dist.*, 234 S.W.3d at 131 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Persuading a court that the challenged conduct cannot reasonably be expected to recur is a "heavy" burden. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).

As a threshold matter, the parties dispute the scope of the challenged conduct. The cheerleaders contend that they are challenging the District's ongoing policy of treating their banners as "government" speech. The District contends that the cheerleaders are only challenging a discrete action by the District—the District's September 18, 2012, announcement that "student groups [are not allowed] to display any religious signs or messages at school sponsored events." In essence, the District contends that in opposing their plea the cheerleaders are attempting to reframe the controversy as broader than they state in their petition. We do not need to resolve this dispute, however, because, as demonstrated below, this case is not moot, even if the cheerleaders' claims are limited to the District's discrete action on September 18, 2012.

The District no longer prohibits the cheerleaders from displaying religious signs or messages on banners at school-

sponsored events. But that change hardly makes "absolutely clear" that the District will not reverse itself after this litigation is concluded, without the cheerleaders' requested declaratory and injunctive relief. *See Bexar Metro. Water Dist.*, 234 S.W.3d at 131. Throughout this litigation, the District has continually defended not only the constitutionality of that prohibition, but also its unfettered authority to restrict the content of the cheerleaders' banners–including the apparent authority to do so based solely on their religious content. In fact, while the District has indicated it does not have any current "intent" or "plan" to reinstate that prohibition, the District has never expressed the position that it could not, and unconditionally would not, reinstate it. The District's stance is a significant factor in the mootness analysis, and one which prevents its mootness argument from carrying much weight. *See Lakey*, 278 S.W.3d at 12 (finding plaintiffs' claims were not moot where defendant had not admitted unconstitutionality of challenged policy); *Bexar Metro. Water Dist.*, 234 S.W.3d at 131 (finding plaintiff's claims against water district were not moot where district had not admitted it was acting outside of its enabling act); *Del Valle Indep. Sch. Dist.*, 863 S.W.2d at 511 (finding challenge to at-large election scheme was not moot "[w]ithout a declaration by the court or an admission by [the defendant] that the at-large system was unconstitutional"); *see also Lubbock Prof'l Firefighters v. City of Lubbock*, 742 S.W.2d 413, 419 (Tex.App.–Amarillo 1987, writ ref'd n.r.e.) (finding plaintiffs' claims were not moot based on defendant's "vigorous trial and appellate opposition to the major claims advanced [by plaintiffs]," which indicated that the defendant had no intention of permanently discontinuing its challenged practices).

Indeed, while there are cases where the defendant's voluntary conduct yielded mootness in the absence of an admission by the defendant that the challenged conduct was illegal, those cases generally involved conduct that could not be easily undone, and thus foreclosed a reasonable chance of recurrence. *See Robinson v. Alief Indep. Sch. Dist.*, 298 S.W.3d 321, 326 (Tex.App.–Houston [14th Dist.] 2009, pet. denied) (finding mootness after defendant expunged plaintiff's personnel file of complained-of material); *Fowler v. Bryan Indep. Sch. Dist.*, No. 01–97–01001–CV, 1998 WL 350488, at *6–7 (Tex.App.–Houston [1st Dist.] July 2, 1998, no pet.) (not designated for publication) (finding mootness after defendant adopted peer sexual harassment policies and training plaintiff sought). This is not such a case: the District's September 18, 2012, prohibition could be easily reinstated.

This case is instead like *Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841 (Tex.App.–Austin 2002, pet. denied). There, the state sent a letter threatening Seton with statutory penalties of "no less than the amount of $153,000" for failing to file certain annual reports. *Id.* at 844. The statute in question provided a civil penalty of no more than $10,000 for "each act of violation," which the state interpreted to mean each day of violation. *Id.* Seton, however, interpreted it to mean each annual report, and filed a declaratory judgment action against the state to that effect. *Id.* After Seton sued, the state withdrew its letter, and conceded in its counterclaim that $10,000 per report was the maximum civil penalty that it sought for the violations at issue. *Id.* at 844–45. The state, however, refused to concede that it misinterpreted the statute or that $10,000 per report was the maximum statutory penalty that it may assess in the future. *Id.* The state nonetheless argued that its conduct had mooted Seton's claims. *Id.* The court of appeals disagreed. *Id.* at

846–47. It held Seton's claims were not moot, because the state's voluntary abandonment of its efforts to collect the $153,000 in the context of the pending lawsuit, without other action, provided no assurance that the state would not adopt its earlier statutory interpretation in future disputes with Seton. *Id.* at 849.

■ Like the state's voluntary abandonment in *Seton*, the District's voluntary abandonment here provides no assurance that the District will not prohibit the cheerleaders from displaying banners with religious signs or messages at school-sponsored events in the future. Indeed, Resolution and Order No. 3 only states the District is not *required* to prohibit the cheerleaders from displaying such banners, and reserves to the District unfettered discretion in regulating those banners—including the apparent authority to do so based solely on their religious content. Thus, like *Seton*, this case is not moot.

Accordingly, we grant the cheerleaders' petition for review and without hearing oral argument, TEX. R. APP. P. 59.1, reverse the court of appeals' judgment and remand the case to that court for further proceedings.

JUSTICE WILLETT filed a concurring opinion.

JUSTICE GUZMAN filed a concurring opinion.

JUSTICE BOYD did not participate in the decision.

JUSTICE WILLETT, concurring.

One of the more memorable scenes in *The Lion King* occurs as Mufasa and Simba sit high atop Pride Rock overlooking Mufasa's kingdom.[1] In this granddaddy of all father-son moments, Mufasa shows Simba the territory he will inherit as king: "A king's time as ruler rises and falls like the sun. One day, Simba, the sun will set on my time here, and will rise with you as the new king." Simba is awestruck: "And this will all be *mine* ?" "Everything," says Mufasa. "Everything the light touches," murmurs Simba in wonder. But then Simba spots dimness in the distance and turns to Mufasa for an explanation: "What about that shadowy place?" Mufasa replies, "That's beyond our borders. You must never go there, Simba."

In narrowly deciding that the school district's policy change did not moot the controversy in this case, the Court today rightfully stays within the borders of its authority, and I concur in full. I write separately, however, to ask, "What about that shadowy place?" The shadowy place in this case is well camouflaged by general phrases like "plaintiffs' claims" and "the constitutional challenge" in today's writings. The reality is that we know there is a live controversy, but we don't know much else. It is unclear from this record which claims are live, and consequently, what this case means for religious liberty—Texans' "natural and indefeasible right to worship Almighty God according to the dictates of their own conscience."[2]

A brief review of the facts illustrates my concern. Cheerleaders of Kountze Independent School District (KISD) profess deeply held religious beliefs. Before every football game, they construct and display run-through banners that KISD players—the mighty Kountze Lions—tear through as they storm the field. For years, the cheerleaders have placed inspirational religious messages on the banners. The messages are often based on Bible verses:

1. THE LION KING (Walt Disney Pictures 1994).

2. TEX. CONST. art. 1, § 6.

"A lion, which is strongest among beasts and turns not away from any."[3]

"I can do all things through Christ who strengthens me."[4]

"If God is for us, who can be against us?"[5]

"But thanks be to God which gives us victory through our Lord Jesus Christ."[6]

The cheerleaders' stated purpose was to express a positive, encouraging message in good sportsmanship, rather than the more fiery expressions displayed on other banners such as "Pluck the Eagles" or "Beat the Bulldogs."

In late 2012, the Freedom from Religion Foundation sought to uproot this tradition. The Foundation alleged in a letter to KISD that the cheerleaders' banners violated the Establishment Clause of the United States Constitution. The Foundation demanded that KISD "take immediate action to end the practice of displaying religious messages before school-sponsored events." KISD opted for preemptive capitulation (a common response) and promptly acceded to the Foundation's "ban the banners" dictate.

The cheerleaders sued KISD and obtained a temporary injunction preventing KISD's prohibition of the banners. The cheerleaders claimed that KISD's prohibition violated their free speech and free exercise rights under the Texas Constitution. They sought permanent relief preventing KISD from further violating those rights. For its part, KISD later concluded that the Establishment Clause did not require KISD to prohibit the banners and permitted the cheerleaders' banners subject to KISD's claimed "right to restrict the content of school banners." KISD denied, however, that it had violated the cheerleaders' free speech and free exercise rights and sought declaratory relief stating that the Establishment Clause did not require it to prohibit the cheerleaders' banners. In the parties' various motions, they vigorously debated whether the speech on the banners was the cheerleaders' private speech or KISD's speech.

That debate culminated in competing motions for summary judgment. KISD's motion repeated its request for declaratory relief on Establishment Clause grounds. The cheerleaders' motion proposed two solutions: (1) the trial court could sign a proposed order that virtually mirrored KISD's request for declaratory relief; or (2) the trial court could hold that the cheerleaders' speech is private speech uttered in a public forum. As to Option 1, the cheerleaders told the trial court that "KISD's sudden adoption of the Plaintiff's position that religious messages on the Cheerleaders' run-through banners are constitutionally permissible vindicates the Cheerleaders' rights and brings this case to an end. All that is required is an appropriate order by the Court." In their words, the cheerleaders sought "the same relief" sought by KISD. The trial court chose Option 1 and signed the proposed order, which, in relevant part, states "[n]either the Establishment Clause nor any other law prohibits the cheerleaders from using religious-themed banners at school sporting events."

Both sides won, right?[7] Apparently not. News coverage following the trial

---

3. *See Proverbs* 30:30.

4. *See Philippians* 4:13.

5. *See Romans* 8:31.

6. *See 1 Corinthians* 15:57.

7. This question alone raises concerns about whether the order was advisory if the parties indeed sought the same relief.

court's order was replete with the parties' conflicting views of the order. KISD's attorneys said the order affirmed that the banners contain the school's speech, while the cheerleaders' attorneys said the order affirmed that the banners contain the cheerleaders' private speech.[8]

The record does not yield a conclusive answer. At the hearing on the parties' pending motions, the cheerleaders told the trial court that the signed order would be an *alternative* to the court having to decide whether their speech was private speech. The cheerleaders said "the order that's in front of the Court right now actually does not ultimately take sides on that question [of government-versus-private speech] but still gives us the relief we are willing to live with in order to be able to bring this case to a conclusion." The day before, however, in support of their summary-judgment motion, the cheerleaders had relied upon the text of the temporary injunction order, arguing that "[a]s

the Court has already determined the messages on the Cheerleaders' banners [are] private speech[,] no additional ruling regarding the nature of the speech is necessary at this time." The temporary injunction order had indeed described the banner speech as "private religious expression." Additionally, the cheerleaders contended that "the Establishment Clause . . . is inapplicable to private speech." which, taken together with the text of the temporary injunction order, could explain the cheerleaders' understanding that the trial court's order designates the banner speech as private speech.

Bottom line: We don't know. What does the trial court's order accomplish? What claims have been preserved? What claims have been waived? In our pitched adversarial system, it is not uncommon for litigants to talk past each other, and uncertainty pervades the parties' briefs to this Court. But answers to these questions are critical for they speak to the funda-

---

8. *See, e.g.,* Texas Judge Rules for Cheerleaders in Bible Banner Suit, Fox News (May 8, 2013), http://www.foxnews.com/us/2013/05/08/texas-judge-rules-for-cheerleaders-in-bible-banner-suit/ (school district attorney *stating the granted motion says* "banners are the speech of the school, not private speech, so the school has a right to have editorial control over banners," versus cheerleaders' attorney stating "there is no ambiguity in the ruling and that the banners are the cheerleaders' protected private speech"); Jim Forsyth, *Texas Judge Rules that Cheerleaders May Display Bible Banners,* Reuters (May 8, 2013, 6:58 PM), http://www.reuters.com/article/2013/05/08/us-usa-texas-cheerleaders-idUSBRE94718W20130508 (cheerleaders' attorney stating "[t]he message that this decision sends is it is impermissible for the government to ban the private speech of students"); Cindy Carcamo, *Texas Court Backs Cheerleaders' Display of Religious Banners,* Los Angeles Times (May 8, 2013), http://articles.latimes.com/2013/may/08/nation/la–na–texas–cheerleaders–20130509 (cheerleaders' attorney stating "I think [the order] has an impact across the country to let people know there is a big difference between

the government [promoting] a message and cheerleaders privately promoting their own message" versus KISD's attorney citing a need "for further clarification" and stating "[w]e don't think you have a free-speech right to put up these banners because this is the school district's function"); Sarah Moore & Cassie Smith, *Anti–Religion Group Offering Fight After Judge Oks Kountze Bible Banners,* Beaumont Enterprise (May 9, 2013, 9:57 AM), http://www.beaumontenterprise.com/news/article/Anti–religion–group–offering–fight–after–judge–4502359.php (cheerleaders' attorney stating, "The establishment (of religion) clause just does not apply to the cheerleaders . . . . State law says it's their banners, not the school district's banners."); *Victory: Judge Says Texas Cheerleaders Can Display Bible Verse Banners,* Fox News Insider (May 9, 2013, 12:06 PM), http://insider.foxnews.com/2013/05/09/judge-says-texas-cheerleaders-can-display-bible-verse-banners (observing "[t]he battle might not be over just yet though, since the school district and the cheerleaders' attorneys disagree on whether the ruling allows administrators 'editorial control' over what is written on the banners").

mental free speech and free exercise rights enshrined in our Constitution.

Because this is an interlocutory appeal, the Court appropriately does not address those core merits issues, rendering Mufasa's admonition that Simba "never go there" inapposite for the moment. But if this case returns to the trial court, a future appellate court, including this one, may well be *required* to go there. My concern is that this case may return to the trial court for a final decision only to reappear on our docket with no clarity as to what this order achieves and what claims are actually live. If that situation arises, the parties and trial court would do well to confront the shadowy place in this litigation and clarify with precision the status of this order and the cheerleaders' claims.

JUSTICE GUZMAN, concurring.

*At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.*[1]

The fundamental right of every American to hold and profess individual religious beliefs is deeply rooted in our constitutional firmament and derives from the ideal of religious liberty that gave birth to our nation. In enacting the Texas Constitution, the people of this great State, "[h]umbly invoking the blessing of Almighty God," further guaranteed freedom of religious expression. *See* TEX. CONST. PREAMBLE & ART. 1, §§ 6–8. While efforts to accommodate competing constitutional interests may necessitate reasonable limitations on each of those interests, the challenge is knowing where to draw the line.

Constitutional analysis is rarely susceptible to doctrinal absolutes, but courts, guided by the words of our charters, must not shy away from defining the contours; otherwise, freedom is compromised. In this case, I agree with the Court that a justiciable controversy is presented.[2] I write separately only to emphasize that, in considering the delicate balance of correlative constitutional rights, free religious expression must be afforded no less than equal respect.

The Constitutions of the United States and the State of Texas protect freedom of expression and guarantee our citizens the right to practice their own religion or no religion at all. *See* U.S. CONST. AMEND. I; TEX. CONST. art. 1, §§ 6–8. Similar to the Texas Constitution, the United States Constitution assures religious freedom through a pair of complementary but potentially opposing directives: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I; *see also* TEX. CONST. art. 1, §§ 6–8; *HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 642 (Tex.2007) (sections 6 and 7 of the Texas Constitution are Establishment Clause equivalents). Given the "internal tension in the First Amendment between the Establishment Clause and the Free Exercise Clause," *Tilton v. Richardson*, 403 U.S. 672, 677, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion), governmental authorities attempting to navigate the fine line that can separate the two risk unduly impinging one in an effort to comply with the other, *cf. Cutter v. Wilkinson*, 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)

---

1. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, ⎯ U.S. ⎯, 133 S.Ct. 2321, 2327, 186 L.Ed.2d 398 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

2. The facts and legal principles pertinent and germane to the jurisdictional inquiry are ably set forth in the Court's opinion, and the details need not be restated here.

(recognizing that these two clauses "often exert conflicting pressures"). Freedom of expression is often felled as collateral damage. Because " 'there is room for play in the joints' between the Clauses," id. neither freedom of expression nor free exercise of religion should be sacrificed at the altar of uncertainty.

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Yet, in untold situations, that is precisely what happens, and it occurs more frequently than our constitutional safeguards permit. Too often, public-school officials unduly target religious speech, at times misunderstanding Supreme Court precedent allowing them to preserve order at school, *see id.* at 513, 89 S.Ct. 733, or due to confusion about the religious-endorsement proscription, *see Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 305–08, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Examples abound:

- A third-grader in Plano Independent School District allegedly tried to give "candy cane ink pen[s]" and bookmarks discussing Jesus and "The Legend of the Candy Cane" as gifts at a school winter-break party. *Morgan v. Swanson,* 659 F.3d 359, 366 (5th Cir.2011) (en banc). School officials prohibited the religious message but allowed other students to distribute nonreligious items at the party. *Id.* The Fifth Circuit, sitting en banc, held that "discriminating against student speech solely on the basis of religious viewpoint [ ] is unconstitutional under the First Amendment." *Id.* at 412 (Elrod, J., writing for majority on this point).

- A second-grader in Plano allegedly tried to give classmates tickets to a religious play at a nearby church, but the principal refused to allow distribution of the tickets. *Id.* at 368–69 (Benavides, J., writing for majority). When the same student celebrated her "half birthday" at school, the principal prohibited her from giving pencils as gifts because the pencils read, "Jesus loves me this I know for the Bible tells me so." *Id.* Again, such viewpoint discrimination is unconstitutional. *Id.* at 412 (Elrod, J., writing for majority on this point).

- An elementary school in Katy allowed parents to purchase student artwork as "holiday cards." *Pounds v. Katy Indep. Sch. Dist.,* 730 F.Supp.2d 636, 639–40 (S.D.Tex. 2010). Citing Establishment Clause concerns, school officials blacked out the only card on the order form referencing a specific deity (Jesus). *Id.* at 639–40. The court held that including the religious card would not have violated the Establishment Clause and that the school's "admitted viewpoint discrimination violated the First Amendment." *Id.* at 639, 660.

- An Arizona elementary school fundraiser allowed parents to purchase personalized tiles to be affixed to the school halls. *Seidman v. Paradise Valley Unified Sch. Dist. No. 69,* 327 F.Supp.2d 1098, 1102 (D.Ariz.2004). The school allowed " 'inspirational' or 'encouraging' messages from parents to their children" on the tiles. *Id.* at 1112. However, citing Establishment Clause concerns, it prohibited "the same type of messages presented from a religious perspective." *Id.*

This impermissible viewpoint discrimination violated the parents' free-speech rights. *See id.* at 1114–15.

- A Florida school district prohibited a fourth-grader from distributing invitations to an Easter egg hunt so her classmates could "have fun and learn the true meaning of Easter." *Gilio ex rel. J.G. v. Sch. Bd. of Hillsborough Cnty.*, 905 F.Supp.2d 1262, 1266–67 (M.D.Fla.2012). The court, however, granted a preliminary injunction enjoining the school district from prohibiting the invitations to religious events "unless such restriction [would be] necessary to prevent a material and substantial interference with schoolwork or discipline." *Id.* at 1265.

- Though students in a Pennsylvania school district were generally allowed to distribute invitations to birthday parties, Valentine's Day dances, and Halloween parties, the district prohibited a fifth-grader from distributing invitations to a church Christmas party. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 102–03 (3d Cir. 2013). The Third Circuit affirmed a preliminary injunction prohibiting the district from stopping the distribution of religious flyers. *Id.* at 102–03.

A review of cases from around the country confirms these are not isolated instances of viewpoint discrimination.[3]

In limited circumstances, courts have allowed school districts to curtail students' religious expression,[4] but the standards for achieving constitutional compliance are not always clear. A litany of cases and an extensive body of literature on this very subject demonstrates the guidance that could enable educators to determine whether the decisions they make comply with constitutional standards is often insufficient. *See Pounds*, 730 F.Supp.2d at 638

**3.** *See, e.g., Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 536 (3d Cir.2004) (holding school district "clearly engaged in a practice of viewpoint discrimination that cannot be justified as an effort to avoid an Establishment Clause violation"); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 373 F.3d 589, 602 (4th Cir.2004) (holding religious organization was entitled to a preliminary injunction granting it access to a school's "take-home flyer forum," and that such access likely would not violate the Establishment Clause); *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1053 (9th Cir.2003) (holding that when school distributed literature for secular summer camps, it could not "refuse to distribute literature advertising an off-campus summer program because it is taught from a Christian perspective"); *Wright ex rel. A.W. v. Pulaski Cnty. Special Sch. Dist.*, 803 F.Supp.2d 980, 981–82 (E.D.Ark.2011) (granting preliminary injunction requiring school to allow student to distribute flyers concerning church-sponsored activities when school already permitted flyers advertising secular activities); *J.S. ex rel. Smith v. Holly Area Sch.*, 749 F.Supp.2d 614, 625, 630 (E.D.Mich.2010) (granting preliminary injunction in student's favor when school banned all "student-to-student distribution of materials"); *O.T. ex rel. Turton v. Frenchtown Elementary Sch. Dist. Bd. of Educ.*, 465 F.Supp.2d 369, 381 (D.N.J.2006) (holding school district's refusal to permit a student to sing a specific religious song at a school talent show "amounted to unlawful viewpoint discrimination").

**4.** *See, e.g., Curry ex rel. Curry v. Hensiner*, 513 F.3d 570, 573–74 (6th Cir.2008) (holding elementary school could prohibit student from "selling" his pipe-cleaner candy canes with an attached religious message at a simulated marketplace as part of the school curriculum); *Walz ex rel. Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 274, 280 (3d Cir.2003) (holding elementary school could prohibit student from distributing candy canes with an attached Christian message at a seasonal holiday party).

& n.1. Confusion exists about the extent to which restraints on religious expression are permissible.

The need for further guidance is exemplified by cases in which perplexed school officials have switched sides multiple times, sometimes allowing and other times disallowing the contested speech.[5] This case presents yet another example of vacillating policy without genuine resolution of the underlying dispute. Quashing free expression may be the most expedient method of alleviating pressure arising from countervailing interests, but suppression must not be perpetuated as a safety valve.

Our state and federal constitutions embody a fundamental commitment to religious liberty and guarantee the freedom to express diverse thoughts without governmental interference. To adequately protect these rights, courts must not jealously guard their jurisdiction when disputes arise. "[O]ur Constitution requires vigilance lest courts overstep their jurisdictional bounds, [but] courts also must dutifully exercise jurisdiction rightly theirs." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 144 (Tex.2012). A justiciable controversy exists in this case because Kountze Independent School District has not met its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). To the contrary, the school district has offered no promise of permanency, only an equivocal and conditional change of policy. *See Lakey v. Taylor ex*

*rel. Shearer*, 278 S.W.3d 6, 12 (Tex.App.–Austin 2008, no pet.) ("Where a policy is challenged as unconstitutional, voluntary cessation of such policy, without an admission or judicial determination regarding its constitutionality, is not sufficient to render the constitutional challenge moot."). Because the constitutional challenge at issue in this case has not been resolved with the degree of assurance required to deprive the courts of jurisdiction over the controversy, I fully join the Court's opinion and judgment.

---

5. *See Hills*, 329 F.3d at 1047–48 (describing how school district repeatedly changed its mind regarding whether a brochure for a summer camp with Bible classes could be distributed at school); *Kiesinger v. Mex. Acad. & Cent. Sch.*, 427 F.Supp.2d 182, 185–87 (N.D.N.Y.2006) (describing school district that sold personalized bricks for sidewalk as a fundraiser; first, the district allowed religious inscriptions on the bricks, then it placed a disclaimer that the messages on the bricks were not its own, and eventually it removed bricks referring to particular religious beliefs).